UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Ft. Pierce Division

**Case Number:  08-14115-CIV-MARTINEZ-LYNCH**

NATIONAL WILDLIFE FEDERATION,
CONSERVANCY OF SOUTHWEST
FLORIDA, COLLIER COUNTY AUDUBON
SOCIETY, FLORIDA WILDLIFE
FEDERATION, NATIONAL AUDUBON
SOCIETY, INC.,

      Plaintiffs,

vs.

PAUL SOUZA, STEVE SULLIVAN, PETE
GEREN, DIRK KEMPTHORNE,

      Defendants.

_____/

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

THIS CAUSE came before the Court upon Plaintiffs' Motion for Summary Judgment
(D.E. No. 31), Intervenor I.M. Collier, J.V.'s Cross-Motion for Summary Judgment (D.E. No.
40), Federal Defendants' Cross-Motion for Summary Judgment (D.E. No. 43), Intervenor I.M.
Collier, J.V.'s Motion to Strike Portions of Plaintiffs' Standing Declarations (D.E. No. 39).  A
hearing was held on these motions on July 29, 2009 and October 15, 2009. After careful
consideration, the Court grants in part and denies in part Plaintiffs', the Intervenor's, and the
Federal Defendants'motions for summary judgment and denies the Intervenor's motion to strike.

### I.  Relevant Factual and Procedural Background

Plaintiffs the National Wildlife Federation, the Conservancy of Southwest Florida, Collier
County Audubon Society, the Florida Wildlife Federation, and the National Audubon Society,

Inc. (collectively "Plaintiffs") are non-profit organizations who have filed suit against Defendants Paul Souza in his official capacity as Field Supervisor for the South Florida Ecological Services Office of the United States Fish and Wildlife Service ("FWS"),[1] Steve Sullivan in his official capacity as the Chief of the South Branch for the Corps of Engineers ("Corps")[2] Regulatory Division in Palm Beach Gardens, Florida, Pete Geren in his official capacity as the Secretary of the United States Department of the Army, and Dirk Kempthorne in his official capacity as Secretary of the United States Department of the Interior (collectively "Defendants"). The Court has also allowed I.M. Collier Joint Venture ("IMC" or "Intervenor"), the owner of the Mirasol property and the entity to which the permit originally issued to J.D. Nicewonder has been transferred, to intervene in this action. *See* (D.E. No. 15).

In 2007, the Corps issued a Clean Water Act ("CWA") § 404 permit to J.D. Nicewonder. Such permit has since been transferred to the Intervenor. Plaintiffs allege that by issuing this permit the Corps "has permitted the destruction of 645 acres of the Cocohatchee Slough in Collier County for a 1,713-acre luxury residential golf community known as 'Mirasol.'" (D.E. No. 1 at 2-3). Plaintiffs allege that the Cocohatchee Slough "stores and filters water needed to sustain life in the Western Everglades." *Id*. at 2. Plaintiffs also allege that the Cocohatchee Slough "provides essential 'core' foraging habitat for the endangered word stork." *Id*. at 3. Specifically, Plaintiffs allege violations of the Endangered Species Act ("ESA"), the Clean Water Act ("CWA"), the National Environmental Policy Act ("NEPA"), and the Administrative

---

[1]In referring to the FWS throughout this order, the Court is collectively referring to Defendants Paul Souza and Dirk Kempthorne, both sued in their official capacity.

[2]In referring to the Corps throughout this order, the Court is collectively referring to Defendants Steve Sullivan and Pete Geren sued in their official capacity.

Procedures Act ("APA").

Plaintiffs are seeking a declaratory judgment, asking this Court to declare (1) that the FWS's biological opinion for Mirasol is invalid and in violation of the ESA and the APA; (2) that the CWA § 404 permit issued by the Corps for the Mirasol project is invalid and in violation of the ESA, the CWA, the NEPA, and the APA; and (3) that the Corps violated the ESA by failing to create and consult over a program for the conservation of the wood stork.[3]  (D.E. No. 1 at 25-26).  Plaintiffs also ask the Court to remand the Mirasol biological opinion so that the FWS may prepare a complete and adequate biological opinion and that the Court order the Corps to revoke the Mirasol CWA § 404 permit pending completion of an environmental impact statement and adequate analysis under the ESA and the CWA.  *Id*. at 26. Finally, Plaintiffs are also asking this Court to permanently enjoin the Corps from taking any action on a new or revised permit application for the Mirasol project unless the Corps prepares a final environmental impact statement and the FWS prepares an adequate biological opinion.  *Id*. All parties have now moved for summary judgment, and the Intervenor has also moved to strike certain declarations filed by Plaintiffs.  The Court now considers these motions.

## II. Motion to Strike

The Intervenor has moved to strike the Declaration of Bradley J. Nunley and portions of twelve other declarations filed with the Court in support of their Motion for Summary Judgment. The Intervenor argues that these declarations constitute extra-record evidence that does not fall within any exception to the general rule that a court may not look outside of the administrative

---

[3]Plaintiffs also ask the Court to order the Corps to create and consult over a conservation program for the wood stork.  (D.E. No. 1 at 26).

record to determine the propriety of an administrative decision.  *See, e.g., Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F. 3d 1242, 1246 (11th Cir. 1996) (stating that "[t]he focal point for judicial review of an administrative agency's action should be the administrative record."). The Intervenor agrees that these declarations are appropriate to establish standing in this case; however, the Intervenor argues that these declarations contain information which has no bearing on the issue of Plaintiffs' standing and argue that these declarations simply inject information outside of the administrative record into this case.  Plaintiffs have responded that the declarations should not be stricken and argue that the declarations were submitted only for the purpose of establishing standing.  (D.E. No. 55 at 2) (where Plaintiffs state that their "[s]tanding [d]eclarations [a]re [o]nly [u]sed to [e]stablish [s]tanding.").  Plaintiffs, however, then state that although the declarations were only submitted for the purpose of establishing standing that it is entirely proper for this Court to consider maps attached to Bradley J. Nunley's declaration.  Plaintiffs then belatedly offer to file a motion to supplement the record with these maps if the Court deems it necessary.[4]

No one has challenged Plaintiffs' standing, and the Court finds it unnecessary to *sua sponte* raise this issue as it finds Plaintiffs do have standing.  The Court finds it unnecessary to strike Plaintiffs' declarations; however, the Court does note that with the exception of the maps attached to Bradley J. Nunley's declaration, it has not considered these declarations in considering the parties' motions for summary judgment as Plaintiffs agree that they were only

---

[4]The Court notes that this offer to file a motion to supplement was made in Plaintiffs' response filed on November 10, 2008 and that the deadline for filing motions to supplement was August 20, 2008.  *See* (D.E. No. 20 at 2).  Thus, the Court finds such an offer is made entirely too late, and if Plaintiffs wanted to supplement the record, a timely motion should have been filed.

submitted for the purpose of establishing their standing, and no party has questioned Plaintiffs'

standing in the motions for summary judgment.  While the Court did not find the maps attached

to Bradley J. Nunley's declaration particularly probative one way or the other, it finds that no

party is harmed or prejudiced by the Court's consideration of these maps. Thus, the Court denies

the Intervenor's motion to strike with the caveats mentioned above.

### III.  Motions for Summary Judgment

Plaintiffs seek summary judgment on all five counts of their complaint.  Defendants

cross-move for summary judgment in their favor, and the Intervenor also moves for summary

judgment in support of Defendants. A motion for summary judgment should be granted "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  By its very terms, this

standard provides that "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there will be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574

(1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of

fact to find for the non-moving party.  *Anderson*, 477 U.S. at 248;  *Matsushita Electric Indus.

Co.,* 475 U.S. at 586.  It is "material" if it might affect the outcome of the case under the

governing law.  *Anderson*, 477 U.S. at 248.  In addition, in considering a motion for summary

judgment, the Court is required to view the evidence in the light most favorable to the non-

moving party.  *Id*. at 255.

"However, even in the context of summary judgment, an agency action is entitled to great deference." *Preserve Endangered Areas of Cobb's History, Inc.,* 87 F. 3d at 1246. Under the APA, this Court reviews an agency action to determine whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "Under this standard, . . . [this Court] give[s] deference to a final agency decision by reviewing for clear error, and . . . [this Court] cannot substitute . . . [its] own judgment for that of the agency." *Sierra Club v. Johnson*, 436 F. 3d 1269, 1273 (11th Cir. 2006). The Court must consider whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 1273-74 (internal quotation marks and citations omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). The Court now considers the parties' motions for summary judgment, which discuss violations of the ESA, the CWA, and the NEPA.

### A.     The Endangered Species Act

First, Plaintiffs argue that the Defendants have violated the ESA. The Supreme Court has characterized the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978). Its stated purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened

species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of [certain listed] . . . treaties and conventions . . . ."  16 U.S.C. § 1531(b).  The Supreme Court has recognized that the legislative history of the ESA "reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species."  *Hill*, 437 U.S. at 185.  In this case, Plaintiffs argue that Defendants have violated the ESA by failing to ensure that the Mirasol project will not jeopardize the wood stork.

Section 7 of the ESA, provides that the Corps must consult with the FWS to "insure that any action authorized funded, or carried out by" the Corps "is not likely to jeopardize the continued existence of any endangered species."  16 U.S.C. § 1536(a)(2).  The agencies engage in a formal consultation process, wherein the Corps and the FWS must "use the best scientific and commercial data available" in determining that the project will not jeopardize the endangered species.  *Id*.  In evaluating the impact of the project on the species, the FWS issues a biological opinion, which details "how the agency action affects the species or its critical habitat" and states the FWS's opinion "as to whether or not the Federal action is likely to jeopardize the continued existence of the listed species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02.  Plaintiffs argue that Defendants violated the ESA because the FWS prepared an inadequate, arbitrary, and capricious biological opinion, which the Corps then relied on in issuing the permit at issue.  Plaintiffs argue that if this Court finds the biological opinion is arbitrary and capricious then it also must find that the Corps's decision to rely on this opinion was arbitrary and capricious in violation of section 7 of

set

the ESA. Finally, Plaintiffs argue that the Corps has violated section 7 of the ESA by failing to create and consult on a meaningful program to conserve the wood stork.  After careful consideration, the Court finds that the FWS's biological opinion is inadequate with regard to its failure to analyze the impacts of other federal projects in the area in analyzing the environmental baseline and based on the FWS's calculation of fish prey density in the opinion.  The Court declines to reach Plaintiffs' argument that Corps's reliance on this biological opinion with respect to these issues was arbitrary and capricious.  The Court, however, finds all Plaintiffs' other arguments are without merit.

### 1.    The FWS's Preparation of the Mirasol Biological Opinion

Plaintiffs argue that the FWS prepared an inadequate biological opinion because in preparing this opinion the FWS (1) failed to meaningfully analyze the environmental baseline, (2) overly discounted Mirasol's habitat because of the presence of melaleuca, an exotic tree, (3) overly discounted Mirasol's habitat in that they miscalculated the available fish for stork feeding, (4) repeated the previous errors with regard to the calculation of Mirasol's habitat in their mitigation calculations, which resulted in the FWS overvaluing the mitigation accomplishments, and (5) based its no-jeopardy determination on an inadequate cumulative impact analysis. After careful consideration, the Court finds that the FWS's biological opinion was arbitrary and capricious based on its failure to analyze the impacts of other federal projects in the area in analyzing the environmental baseline and based on the FWS's calculation of fish prey density in the opinion.  The Court also finds that the FWS's biological opinion was also arbitrary and capricious to the extent the FWS relied on this calculation of fish prey density in calculating mitigation and in its assessment of the cumulative effects.  The Court finds, however, that

Plaintiffs' other arguments on this issue are without merit.

### a.      Analysis of Environmental Baseline

First, Plaintiffs argue that the FWS's biological opinion was arbitrary and capricious because it did not meaningfully analyze the environmental baseline. The Code of Federal Regulations states that the environmental baseline

> includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

50 C.F.R. § 402.02.  Plaintiffs specifically argue that the FWS's analysis of the environmental baseline is arbitrary because it failed to adequately (1) "account for the effect of an exotic tree, melaleuca, on wetlands throughout the habitat," (2) "analyze the status of short-hydroperiod wetlands in the action area,"[5] and (3) "grapple with the effects of other nearby proposed federal projects."  (D.E. No. 31-2 at 7-8).  After careful consideration, this Court finds that the FWS did adequately address the majority of these issues; however, their analysis of the environmental baseline in the biological opinion was arbitrary, capricious, contrary to law, and an abuse of discretion in that the FWS failed to analyze the impacts of the other federal projects in the area.

First, the Court finds that the FWS's discussion of the environmental baseline adequately discusses the effect of melaleuca on wetlands throughout the habitat. Plaintiffs argue that the FWS's assessment was arbitrary because "without support" the FWS estimated that 10% of the

---

[5]"Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.  The FWS defines its action area for this project as the core foraging areas "for the three wood stork colonies . . . [,] [which] includes the footprint of the proposed development and preserve areas." (D.E. No. 32-4, biological opinion at 71).

core foraging area would have dense melaleuca coverage and because the FWS made "no attempt" to calculate the percentage of melaleuca coverage in the remaining acres.  *Id*. at 15. This Court disagrees.

In the biological opinion, while discussing the environmental baseline, the FWS does in fact estimate the percentage of melaleuca coverage in the remaining area, state the source of this estimate, and state what this estimate is based on.  The FWS states that "based on" their "aerial surveys and site inspections by Service personnel of wetland systems throughout the action area" that 10% of the remaining acreage would have "dense melaleuca coverage."  (D.E. No. 32-4, biological opinion at 67).  Thus, it is not accurate to state that the FWS made "no attempt" to calculate the percentage of melaleuca coverage in the remaining areas or that its estimate was made "without support."  Plaintiffs also appear to suggest that the FWS should have calculated the percentage of melaleuca present in the action area in the same manner it was calculated for the Mirasol site.  Here, however, there is no evidence in the record which demonstrates that this estimate was not made based on the best available scientific and commercial data or that it was either arbitrary, capricious, contrary to law, or an abuse of discretion for the FWS to make this estimate in this manner.[6]

Next, the Court finds that the FWS's environmental baseline adequately assesses the importance of short hydroperiod wetlands[7] for wood stork foraging.  Plaintiffs argue that the FWS's environmental baseline analysis is inadequate because it does not analyze the loss of short

_____

[6]The fact that the melaleuca presence found by the FWS in the actual Mirasol site was greater does not change this conclusion.

[7]The FWS states that it considers short hydroperiod wetlands to be those wetlands that are "inundated for 180 days or fewer."  (D.E. No. 32-4, biological opinion at 72).

hydroperiod wetlands, what this loss means to the wood storks, and the effect of the fact that 85% of theses wetlands have already been destroyed.  Plaintiffs also argue that the FWS's analysis is inadequate because it does not estimate how many acres of short hypdroperiod wetlands remain in the action area and how many of these acres are needed to sustain the wood storks.  The Court finds these arguments are without merit.

In the biological opinion, the FWS acknowledges the importance of short hydroperiod wetlands to wood storks, particularly to their early nestling survival.  *Id*. at 39-40.  The FWS also recognizes the "disproportionate reduction (85 percent)" in short hydroperiod wetlands and discusses the effects this loss is having on the wood storks.  *Id*. at 40.  The FWS states that these short hydroperiod wetlands "are needed to ensure survival and to sustain development of nestlings." *Id*.  In their assessment of the environmental baseline, the FWS also provides a detailed assessment of the hydroperiod wetlands in the action area.  *Id*. at 67-72, 118-119.

It is undisputed that the FWS does not estimate the amount of short hydroperiod wetlands in the entire action area nor does it estimate the number of wetlands needed to sustain the wood storks; however, there is no requirement under the law that such data be included in the environmental baseline nor is there any indication that the FWS's failure to include such information was arbitrary, capricious, or an abuse of discretion.  Under the APA, this Court gives substantial deference to the FWS's decisions as to "what evidence to find credible" and "drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue," finding such decisions inadequate only where they are arbitrary, capricious, or an abuse of discretion.  *Sierra Club v. Van Antwerp*, 526 F. 3d 1353, 1361 (11th Cir. 2008).  Here, the FWS's failure to include the specific information noted by Plaintiffs does

not meet this standard.

The  Court, however, finds that the FWS did not adequately consider the other federal

projects in their biological opinion. Plaintiffs argue that the FWS's discussion of the

environmental baseline is arbitrary and capricious because the biological opinion fails to discuss

the combined impacts of other federal projects in the action area including Saturnia Falls,

Parklands, Cypress Run, and Bonita Beach Road.  This Court agrees.

Pursuant to 50 C.F.R. § 402.14(g) during formal consultation, the FWS is required to

"[e]valuate the effects of the action and cumulative effects on the listed species or critical

habitat."  The "[e]ffects of the action refers to the direct and indirect effects of an action on the

species or critical habitat, together with the effects of other activities that are interrelated or

interdependent with that action, that will be added to the environmental baselines."  50 C.F.R.

402.02.  As previously stated the environmental baseline "includes all the past and present

impacts of all Federal, State, or private activities in the action area, the anticipated impacts of all

proposed Federal projects in the action area that have already undergone formal or early section 7

consultation, and the impact of State or private actions which are contemporaneous with the

consultation process." *Id*.  Indirect effects "are those that are caused by the proposed action and

are later in time, but still are reasonably certain to occur."  *Id*.

Thus, it is clear that under the regulations, the FWS was required to evaluate the impact

of other projects in the action area in its analysis of the environmental baseline and that it was

required to analyze the effects of the action in conjunction with the impacts that constitute the

baseline.  While the biological opinion does reference these other projects, *see* (D.E. No. 32-4,

biological opinion at 2, 6, 107), there is no analysis of these projects or their impacts.  "Simply

-12-

reciting the activities and impacts that constitute the baseline and then separately addressing only the impacts of the particular agency action in isolation is not sufficient." *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127-28 (D.D.C. 2001); *see also Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1149 (W.D. Wash. 2000) ("Although BiOp2 states that its conclusions are based on a 'cumulative effects analysis,' . . . and even contains a section titled 'Cumulative Effects,' . . . in fact this section contains no analysis whatsoever and is nothing more than a list of the fisheries regulated by the state of Alaska or granted by treaty to Native Americans. The section contains no explanation of how the various groundfish fisheries and fishery management measures interrelate and how the overall management regime may or may not affect Steller sea lions."). Thus, the Court finds that the analysis of the environmental baseline in the biological opinion was arbitrary and capricious with regard to the FWS's failure to adequately assess the other federal projects in their biological opinion.[8]

> **b.       Assessment of Mirasol Habitat and the Presence of Melaleuca**

Next, Plaintiffs argue that the biological opinion was arbitrary and capricious because the FWS overly discounted the amount of suitable habitat for the wood stork because of the presence of melaleuca. Specifically, Plaintiffs argue that the FWS's calculation of the amount a wetland should be discounted is inaccurate because the FWS arbitrarily created a formula based on a

---

[8]It is unclear if Defendants are arguing that it was improper for them to include an analysis of the impact of the Saturnia Falls project simply because it had not finished its review of the project yet or if they are arguing more precisely that the Saturnia Falls project had not "undergone formal or early section 7 consultation." 50 C.F.R. § 402.02.  It is equally unclear from the record whether the Saturnia Falls project had undergone formal or early section 7 consultation at the time the Mirasol biological opinion was issued.  However, even if it was too soon to include an analysis of the Saturnia Falls project, this does not excuse the FWS's failure to analyze the other projects.

-13-

study by O'Hare & Dalrymple ("Dalrymple Study").  Plaintiffs also argue that the FWS's

calculations are arbitrary because the FWS did not consider the nature of the surrounding

landscape when calculating habitat values, the importance of melaleuca-infested wetlands in

nurturing wood stork prey, or the beneficial effects of melaleuca bio-control agents. After careful

consideration, this Court finds these arguments are without merit.

First, the Court finds it was not arbitrary, capricious, contrary to law, or an abuse of

discretion for the FWS to create a formula based on the Dalrymple Study to evaluate the foraging

suitability of the subject wetlands.  In the biological opinion, the FWS relies on the Dalrymple

Study, which analyzes the effect of melaleuca upon wildlife in the southern everglades wetlands.

*See* (D.E. No. 32-4, biological opinion at 65-67); (D.E. No. 42-11, Dalyrymple Study).  This

study identifies five melaleuca coverage types, ranging from 0 to 10% melaleuca coverage to 75

to 100% melaleuca coverage, and provides information on the number of wetland-dependent[9]

bird species and individuals observed within the different classes.  (D.E. No. 42-11, Dalrymple

Study at 5, 61). The FWS used the information in this study to develop a foraging suitability

value, which they calculated by multiplying the number of species identified at a site without

melaleuca by the number of individuals seen at a site with 0 to 10% melaleuca coverage making

this value the number that assumes 100% suitability and then dividing the result of the number of

species multiplied by the number of individuals for each level of coverage by the number used to

represent 100% suitability. (D.E. No. 32-4, biological opinion at 66, 117).  The FWS then

---

[9]The Dalrymple Study defines "wetland dependent" birds as those "whose respiration, feeding mechanisms, diet, reproduction, or larval development require 1 to 12 months of standing water each year."  (D.E. No. 42-11 at 11).  It also states that "[a]nimals described as 'wetland dependent' use upland habitats, but a population could not persist without suitable wetland habitats."  *Id.*  The study classified wood storks as wetland dependent birds.  *Id.* at 67.

developed a foraging suitability index based on these calculations. *Id.*

Plaintiffs argue that the creation of this index was grounded in arbitrary calculations based on an opinion from Jason Lauritsen, the Big Cypress Ecosystem Science Coordinator for the Aubdubon of Florida, and their argument that this calculation is not sufficiently based on the specific habits of wood storks. First, Lauristen states that "[t]here is no compelling scientific justification for using the . . . Dalrymple [S]tudy in this manner." (D.E. No. 33-13 at 5). Whether the FWS's method of calculation was compelling or not, however, is immaterial. It is also not enough that the FWS and other experts disagree. The relevant question is whether such calculations were arbitrary, capricious, contrary to law, or an abuse of discretion. *See Fla. Keys Citizens Coalition, Inc. v. Army Corps of Eng'rs,* 374 F. Supp. 2d 1116, 1162 (S.D. Fla. 2005) (finding that while "Plaintiffs and possibly others may disagree" with an agency's expert opinions "such disagreement is insufficient for the Court to declare that the . . . biological opinions . . . are arbitrary and capricious."). Here, there is no evidence that the FWS's calculations meet these standards.

The Court also finds that it was not arbitrary, capricious, or an abuse of discretion for the FWS to rely on the Dalrymple Study to create the foraging suitability index even though this study does not focus exclusively on wood storks. There is no evidence that this study did not represent the best available scientific data from which the FWS could extrapolate from to create their index or that the creation of such an index was unreasonable.[10]

---

[10]The Court disagrees that the Dalrymple Study itself indicates that it should not be used in the manner used by the FWS. The study simply states that its focus was "to determine species richness and relative abundance along the single gradient of melaleuca coverage" rather than to demonstrate the differences in the habitat quality for wetland animals versus upland animals, or native versus non-native animals. (D.E. No. 42-11, Dalrymple Study at 3). The Court also finds

-15-

The Court also finds that the FWS did not fail to take into account the nature of the surrounding landscape.  Plaintiffs argue that the FWS "disregards all scientific evidence when it calculates the value of habitat based only on the percentage of melaleuca coverage-ignoring the nature of the surround landscape."  (D.E. No. 31-2 at 18).  The FWS's evaluation of the habitat in the action area, however, was not informed solely by their application of the foraging suitability index.  The biological opinion demonstrates that the FWS clearly took other factors including the surrounding landscape into account when determining the value of the habitat.  *See* (D.E. No. 32-4, biological opinion at 62-78). There is no evidence that the FWS's failure to incorporate the factor of the surrounding landscape into their formula or their index was arbitrary, capricious, contrary to law, or an abuse of discretion. To the extent Plaintiffs are arguing that using melaleuca coverage to discount the value of the habitat at issue was in error because of other expert opinions, the Court finds that this does not demonstrate that the FWS's findings otherwise were arbitrary, capricious, contrary to law or an abuse of discretion.  *See Fla. Keys Citizens Coalition, Inc.,* 374 F. Supp. 2d at 1162 (where the court found it proper to defer "to the agency's expertise and discretion.").

In addition, the Court finds that the FWS did not fail to consider the importance of melaleuca-infested wetlands in nurturing wood stork prey.  Plaintiffs argue that in the biological opinion, the "FWS fails to acknowledge that land with dense melaleuca is still valuable because it provides habitat for wood stork prey."  (D.E. No. 31-2 at 19).  The biological opinion, however, does not discount all melaleuca-infested land, but simply concludes that the wetlands

---

that Plaintiffs' citation to the Dalrymple Study for the proposition that wood storks were not sufficiently evaluated in the study is not supported by the record.  The study clearly considered the effects of melaleuca on wood storks.  *See* (D.E. No. 42-11 at 11, 67).

with "dense melaleuca coverage provide little to no foraging value to wood storks." (D.E. No. 32-4, biological opinion at 66). Again, to the extent that Plaintiffs are disagreeing with the value the FWS assigned to certain melaleuca-infested wetlands based on their own expert opinions, this does not demonstrate that the FWS's findings were arbitrary, capricious, contrary to law, or an abuse of discretion.[11] *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (stating that in determining whether an agency decision was arbitrary or capricious, the standard of review is narrow and "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

Finally, the Court finds that the FWS's biological opinion was not arbitrary and capricious because it fails to discuss the beneficial effects of melaleuca bio-control agents. Plaintiffs argue that the FWS had to analyze the effects of these bio-controls and their potential to eradicate the melaleuca in their biological opinion. The administrative record, however, demonstrates that the effectiveness of these bio-control agents in reducing the "abundance and invasion potential" of melaleuca is unclear. (D.E. No. 52-4, Pratt's Study at 10). The study in the record indicates that bio-control agents cause melaleuca to produce new stems and replace foliage, however, it also causes them to reproduce at a lower rate. *Id*. Thus, while the spread of melaleuca could possibly be slowed by the introduction of bio-control agents, there is no evidence in this study relied on by both parties that these agents would eliminate melaleuca from areas already infested with the tree. *Id*.; *see also* (D.E. No. 44-6 at 3). Given this evidence in the record, it was not arbitrary, capricious or an abuse of discretion for the FWS to fail to discuss

---

[11]Other opinions in the record indicate otherwise. (D.E. No. 44-6 at 3-4).

these bio-control agents in the biological opinion.  Moreover, this is an area clearly within the technical expertise of the agency to which this Court should defer.  *See Fla. Keys Citizens Coalition, Inc*., 374 F. Supp. 2d at 1162 (where the Court found it proper to defer "to the agency's expertise and discretion.").

### c.      Assessment of Mirasol Habitat and the Presence of Fish

Plaintiffs also argue that the FWS's biological opinion was arbitrary and capricious because it devalued a number of wetlands based on a miscalculation of the available fish for stork feeding.  Specifically, Plaintiffs argue that the FWS miscalculated the amount of fish biomass consumed by storks because the FWS inappropriately restricted the stork prey to a size range of 1.5 cm to 9 cm, although Plaintiffs argue that wood storks actually prefer larger fish. Plaintiffs also argue that the FWS in their biological opinion erred in their calculations of fish prey density because it relied on only select portions of the Trexler Study, which applied only to small fish.[12]  After careful consideration, the Court finds that the FWS calculation of fish biomass was not arbitrary and capricious; however, its calculation of the fish prey density was arbitrary and capricious.

First, the Court finds that the FWS did not inappropriately restrict the stork prey to a size range of 1.5 cm to 9 cm. Evidence in the record supports the FWS's conclusion that "wood storks . . . generally . . . [consume] fish that . . . [are] between 1.5 and 9.0 cm in length." (D.E. No. 32-4, biological opinion at 69)  In the biological opinion, the FWS makes this conclusion based on the Ogden Study (D.E. No. 34-7), which shows in Figure 4 the "[l]ength frequency

---

[12]The Trexler Study defines small fish as those that are less than 8 cm and large fish as those that are greater than 8 cm.  (D.E. No. 34-6, Trexler Study at 8).

distribution of fish available to and consumed by Wood Storks in different habitats." (D.E. No. 34-7 at 6, Figure 4). Specifically, it shows that fish available to wood storks in mangrove, coastal, and everglades areas ranged in length from 0.5 cm to 11.0 cm and that fish consumed in these areas by the wood storks ranged in length from 1.5 cm to 9.0 cm. *Id.*

To the extent Plaintiffs are arguing that the Ogden Study actually contradicts the FWS's conclusion, the Court finds these arguments are without merit. First, Plaintiffs argue that the Ogden Study concludes that "'fish larger than 8 cm were highly selected' and 'larger individuals [fish] were selected.'" (D.E. No. 31-2 at 21) (quoting D.E. No. 34-7, Ogden Study at 5). Taking these quotes in context, however, the study in the section from which the quotes were taken is actually a discussion of the different species of fish that wood storks like to eat and the different sizes of the specific types of fish they prefer. The study actually states that "[t]he pattern for the marsh killifish was also inconsistent but showed that fish larger than 8 cm were highly selected. It appears in general that for most species, larger individuals were selected while in a few species there is little evidence of selectivity of size." (D.E. No. 34-7, Ogden Study at 5). Nothing in this statement contradicts Figure 4 in the Ogden Study depicting wood storks' general preference for fish measuring 1.5 cm to 9 cm.

The Court also finds that Plaintiffs' argument that the FWS made a statement within their biological opinion which contradicts their conclusion that wood storks generally eat fish measuring 1.5 cm to 9 cm is without merit. Specifically, the FWS states in the "Life History" section of their biological opinion that wood storks "feed almost entirely on fish between 2 and 25 cm . . . in length . . . but may occasionally consume crustaceans, amphibians, reptiles, mammals, birds, and arthropods." (D.E. No. 32-4, biological opinion at 38). This statement

does not belie the FWS's later statement in the biological opinion that they "generally consume" fish measuring 1.5 cm to 9.0 cm.  The statement cited by Plaintiffs in the "Life History" section simply acknowledges the range of species that a wood stork will eat.

In addition, to the extent Plaintiffs are arguing that other studies have found that wood storks generally consume fish larger than 9 cm, the Court finds it inappropriate to engage in a battle of the experts under the deferential standard of review in this case.  There is no evidence that the FWS's reliance on the Ogden Study for the proposition that wood storks generally consume fish between 1.5 cm and 9 cm was arbitrary, capricious, contrary to law, or an abuse of discretion.

The Court, however, does find that the FWS's calculation of fish prey density was arbitrary, capricious, and an abuse of discretion.  In the biological opinion, the FWS calculated the fish prey density, or number of fish per square meter, per hydroperiod. The FWS performed this calculation by extrapolating the fish densities from the Trexler Study (D.E. No. 34-6) to the seven hydroperiods used by the FWS in this case.[13]  The fish densities used in the Trexler Study and adopted by the FWS in their biological opinion were based on "throw-trap samples" or fish caught by use of a throw-trap.  (D.E. No. 34-6 at 16).  The Trexler Study states that these throw-traps were used to target small fish or fish less than 8 cm in length.[14]  In the biological opinion, however, the FWS uses the data in the Trexler Study as if it represents all fish, regardless of their

---

[13]The Trexler Study provided fish densities for only six hydroperiods, although it covered the same range of hydroperiods used by the FWS in this case. (D.E. No. 34-6, Trexler Study, at 16); (D.E. No. 32-4, biological opinion at 68).

[14]Boat electrofishing was used to target larger fish or those greater than 8 cm.  (D.E. No. 34-6 at 8).

size, found in a specific hydroperiod.  The FWS does not explain this discrepancy in the

biological opinion.  In addition, neither the Defendants nor the Intervenor has specifically

responded to this discrepancy in their briefs.  The Court finds that the FWS's unexplained

reliance on this source of data which applies only to fish less than 8 cm as a basis for determining

the density of all fish in the hydroperiods was arbitrary and capricious.  *See Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mutual Ins*., 463 U.S. 29, 43 (1983) (stating that a "reviewing court should

not attempt itself to make up for deficiencies . . [and cannot] 'supply a reasoned basis for the

agency's action that the agency itself has not given.'") (quoting *SEC v. Cheney Corp*., 332 U.S.

194, 196 (1947)); *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, Inc*., 462 U.S. 87,

105 (1983) (stating that the relevant inquiry in determining whether an agency decision should be

overturned is whether there is "a rational connection between the facts found and the choice

made.").

        Moreover, the fish densities extrapolated from the Trexler Study for the seven

hydroperiods most certainly effect the FWS's analysis in the biological opinion as these fish

densities were used to calculate the fish biomass per hydroperiod, which in turn was used to

calculate the wood stork suitable prey size per hydroperiod, which was then used in the FWS's

calculation of the affect of the action.  (D.E. No. 32-4 at 68-81).  Thus, this unexplained use of

the Trexler Study as a source from which to extrapolate data had far-ranging effects on the

FWS's analysis.

                    **d.      Habitat Value and Mitigation Calculations**

        Plaintiffs also argue that the FWS's biological opinion is arbitrary and capricious because

"[i]f this Court finds that FWS overly . . . [devalued] the habitat due to melaleuca, then they are

necessarily overly valuing mitigation credit from melaleuca removal." (D.E. No. 53 at 8). As discussed, above, however, the Court did not find that the FWS's conclusions in their biological opinion relating to the melaleuca were arbitrary and capricious. However, to the extent the mitigation calculations are based on the unexplained calculation of fish prey density, these mitigation calculations are arbitrary and capricious.

### e.      Assessment of Cumulative Impacts

Finally, Plaintiffs argue that the FWS's biological opinion is arbitrary and capricious because the FWS "fails to undertake any meaningful analysis of the effects of Mirasol combined with the cumulative effects of surrounding activities." (D.E. No. 31-2 at 14). Cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. Plaintiffs argue that the FWS's analysis is inadequate because it simply lists the state and private projects at issue and its percentage finding of wetland loss to the three stork colonies without any further analysis or explanation as to what this loss means for the wood storks, because the amount of acreage the FWS has devalued, 433,500 acres, is inaccurate for the same reasons Plaintiffs argue the FWS failed to meaningfully analyze the environmental baseline, and because the FWS's percentage finding of wetland loss is wrong-- the loss is 0.2 % not 0.02 %. After careful consideration, the Court finds that the FWS's assessment of the cumulative effects was arbitrary and capricious only to the extent that the FWS relied on their unexplained calculations of fish prey density in making their conclusion that the wetland loss was not significant.

First, the Court finds that the FWS did not perform an adequate analysis of the

cumulative impacts of the state or private actions to the extent that the FWS relied upon their unexplained calculation of fish density or biomass, which the Court has previously found was arbitrary or capricious.  The Court, however, does not find that the FWS's analysis of the cumulative impacts was otherwise deficient.  In the biological opinion, the FWS identified state and county actions affecting the wood stork habitat.  (D.E. No. 32-4, biological opinion at 81).  The FWS identified "47 projects within the combined wood stork foraging area encompassing about 12,201 acres affecting 147 acres of wetlands." *Id*. at 82.  These projects are listed in a detailed table showing each project's Wetland Acreage SUM, Project Acreage SUM, Percent Wetlands, and Permit Date (Final Agency Action).  *Id*. at 126-27.  The FWS also considered the effects of developments in Northern Golden Gate Estates and Lehigh Acres, finding an additional 762 acres of wetlands associated with these developments.  *Id*. at 82.  Thus, the FWS found a total of 909 acres out of the total 433,500 acres of wetland habitat in the core foraging areas were affected by state or private activities.  *Id*. at 67, 82.

The FWS concluded that "[a]lthough these wetlands may be adversely affected by non-federally reviewed actions and the productivity as a foraging prey base for wood storks may be affected, we believe based on the status of the species in the action area, the loss/reduction of foraging value to the wood storks associated with these systems is not significant . . . ." *Id*. at 82.  Thus, the FWS's assessment of the cumulative impacts relies on its previous assessment of the status of the species in the action area and its assessment of the wood stork foraging habitat in the action area.  Because the FWS used the "fish density (biomass) available to the wood stork from the biomass of the wetlands affected" in part to assess the wood stork foraging habitat and the Court has already found that the calculations used to determine this were arbitrary and capricious,

-23-

the assessment of the cumulative impacts is also arbitrary. *See* (D.E. No. 32-4, biological

opinion at 72) (identifying "the fish density (biomass) available to the wood stork from the

biomass of the wetlands affected" as one of the four essential variables in assessing wood stork

foraging habitat.).

      As described above, however, the FWS did perform an analysis of the state and private

actions "reasonably certain to occur within the action area." 50 C.F.R. § 402.02.  This is not a

situation where there is no indication that the FWS considered the cumulative effects at all,

where the FWS failed to identify any state or private projects at all, or where the FWS just listed

the state and private actions without any analysis of the potential effects on species. *See, e.g.,*

*Pacific Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.,* 265 F.2d 1028,

1036-37 (9th Cir. 2001) (finding no evidence in the record that the National Marine Fisheries

Service actually performed an analysis of the cumulative impacts); *Nat'l Wildlife Fed'n v.*

*Norton*, 332 F. Supp. 2d 170, 178 (D.D.C. 2004) (where the FWS failed to identify any private

projects reasonably certain to impact the endangered species's habitat and failed to explain the

meaning of their disturbance intensity numbers); *Greenpeace*, 80 F. Supp. 2d at 1149 (where the

cumulative effects section of a biological opinion contained "no analysis whatsoever and . . .

[was] nothing more than a list of the fisheries regulated by the state of Alaska or granted by treaty

to Native Americans.").

      The Court also does not find that the FWS's assessment of the cumulative effects in the

biological opinion was arbitrary and capricious because they miscalculated the amount of core

foraging area consistent with the arguments Plaintiffs made relating to these issues in relation to

the calculation of the environmental baseline.  *See supra* section III.A.1.a.[15]

Finally, Defendants and the Intervenor concede that the FWS's calculation of the percentage finding of wetland loss was wrong.  The loss is 0.2% not 0.02%.  To the extent that this error was stated in the biological opinion, it should be corrected when the FWS revisits its biological opinion for the reasons already stated in this section.  The Court, however, does not find that this typographical error by itself was arbitrary or capricious.  The numbers used to calculate this percentage are listed in the biological opinion, and there are no typographical errors relating to the numbers themselves.  *See* (D.E. No.32-4, biological opinion at 67, 82).  Thus, for the reasons stated above, the Court finds that the FWS's assessment of the cumulative effects was arbitrary and capricious only to the extent that they relied on the unexplained calculations of fish density in making their conclusion that the wetland loss was not significant.

### 2.    The Corps's Reliance on the Mirasol Biological Opinion

Next, Plaintiffs argue that for the same reasons that the FWS's biological opinion was arbitrary and capricious in violation of the ESA, the Corps's decision to rely on the Mirasol biological opinion was arbitrary and capricious in violation of the ESA.  The Court has already found that the FWS's biological opinion for the Mirasol project was arbitrary and capricious with regard to certain issues.  "A federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious."  *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the*

---

[15]The Court acknowledges that it found the FWS's assessment of the environmental baseline was arbitrary and capricious because it did not adequately analyze the effects of the other federal actions.  However, in assessing the cumulative impacts the Court does not consider actions subject to federal review.  50 C.F.R. § 402.02.

*Navy*, 898 F. 3d 1410, 1415 (9th Cir. 1990).  The Court, however, declines to reach this issue as

the biological opinion must be remanded to the FWS for further consideration.  *See Norton*, 332

F. Supp. 2d at 185 (declining to reach the issue of whether the Corps acted arbitrarily and

capriciously based on their reliance on an arbitrary biological opinion and finding that "because

the Corps relied on a . . . [biological opinion] that must be remanded to the FWS, it is also

appropriate to revoke the permit.").[16]

### 3.      Conservation Program

Finally, Plaintiffs argue that the Corps has violated the ESA because it has failed to

"create and consult on a meaningful program to conserve the wood stork."  (D.E. No. 31-2 at 25).

Section 7(a)(1) of the ESA provides that "[a]ll . . . Federal agencies shall, in consultation with

and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of

this chapter by carrying out programs for the conservation of endangered species." 16 U.S.C. §

1536(a)(1).  The ESA defines conservation as "the use of all methods and procedures which are

necessary to bring any endangered species or threatened species to the point at which the

measures provided pursuant to this chapter are no longer necessary."  16 U.S.C. § 1532(3).

Defendants argue that they have created a sufficient program to conserve the wood stork by

preparing and implementing the Southwest Florida Environmental Impact Statement

_____

[16]The Court does note that the absence at least of the analysis of the impacts of the federal
actions should have been apparent to the Corps in reviewing the biological opinion.  Moreover,
these issues were brought up before the Corps in the permit review process.  *See* (D.E. No. 33-12
at 5, 7-9); (D.E. No. 33-14 at 28-29); *see also Ctr. for Biological Diversity v. Rumsfeld*, 198 F.
Supp. 2d 1139, 1157 (D. Ariz. 2002) (finding that where the biological opinion "omitted a
critical component," namely the "necessary mitigation measures to address the long term adverse
impacts of the Army's proposed activities over the next ten years" and the Army knew of the
need to address these concerns but still sought to rely on the FWS's opinion, "[t]he Army
committed a clear error in judgment.").

("SWFEIS").  *See* (D.E. Nos. 44-11, 44-12, 44-13, 52-5, 52-6). After careful consideration, this

Court finds that the Corps has met the requirements of section 7(a)(1) of the ESA.

In this case, the Court finds that the preparation and implementation of the SWFEIS

demonstrates that the Corps has created a meaningful program to conserve the wood stork and

that it has carried out programs for the conservation of the wood stork.  The Corps "initiated the .

. . [SWFEIS] out of concern [for] whether the incremental (permit-by permit) reviews[17] were

adequately addressing cumulative and secondary effects of the wetland filling the rapidly

growing Southwest Florida area."  (D.E. No. 52-5 at 2). The Corps specifically notes that

scrutiny of their process is important because of the "important resources" in the area, including

ten endangered or threatened species.  *Id*. at 1, 3.  In the SWFEIS, the Corps proposes "to use the

information in . . . [the SWFEIS] in the review of future permits" to better identify issues

relevant to the proposed project.  The Corps has also developed "a set of standardized natural

resource criteria" to be used in review permit applications in southwest Florida.  *Id*.

In the SWFEIS, the Corps specifically provides information regarding the wood stork.

The Corps discusses the habitat of the wood stork, their breeding and nesting habits, and their

dependence on wetlands.  *Id*. at 66; (D.E. No. 52-6 at 12-15)  It also notes the decline in the last

several decades of the wood stork in south Florida's wetlands and links this decline to the loss

and degradation of south Florida wetlands. *Id*. The Corps discusses the species and habitat-level

recommendations for the protection of the wood stork in the FWS's Multi-Species Recovery

Plan and a study by the Florida Game and Freshwater Fish Commission entitled "Closing the

---

[17]Under section 404 of the Clean Water Act, a landowner who desires to fill wetlands on
his or her property must seek a permit from the Corps.

Gaps in Florida's Wildlife Habitat Conservation System," which "modeled wetland systems of potential importance to wood stork nesting colonies based on approximate distances that individual species will travel to forage." (D.E. No. 52-6 at 12-13, 20-21). The SWFEIS also gives recommendations "for the recovery of the species" with specific emphasis on the protection or restoration of existing wetlands. *Id*. at 14 (stating that the "ability of the species to search for new locations gives great hope for the recovery of the species but only if that species has 'options' for establishing nesting locations."); *see also* (D.E. No. 52-5 at 60) (stating that "[m]aintenance/restoration of short hydroperiod wetlands restores historic [wood stork] nesting productivity and foraging habitat availability."). Thus, the Court finds that the Corps has created a program to preserve the wood stork in compliance with section 7(a)(1) of the ESA.

The SWFEIS also provides for a set of standardized criteria to be used in reviewing permits. In this section with respect to wood storks and other wading birds, the Corps notes that there are several reported rookeries or breeding grounds in the area and that development could occur near this rookeries. (D.E. No. 33-7 at 16); *see also* (D.E. No. 52-6 at 113) (listing wood storks as wading birds). When considering development near the breeding grounds of the wading birds, the Corps states that it should "[p]reserve [the] actual rookery location and areas used for foraging or transit by providing buffers of native vegetation." *Id*. The Corps also states that "[b]uffers [should be] sized to protect [the] rookery from visual and noise disturbance (size: depending upon nature of activity in proposed project and type of native vegetation) and arranged to discourage people [from] visiting the site." *Id*.

The Court also finds that the Corps consulted with the FWS in creating their conservation program. Plaintiffs quote a portion of the SWFEIS and argue that "the SWFEIS acknowledges

that '[c]onsultation with [the FWS] in accordance with [ESA 7] was not completed.'" (D.E. No. 53) (quoting D.E. No. 52-5 at 50).  The Court finds, however, that Plaintiffs have taken this quote out of context.

Section 2.7.2 of the SWFEIS where this quote appears states that "[c]onsultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service . . . in accordance with Section 7 of the ESA was not completed for any alternative presented in this . . . [draft environmental impact statement]. . . . Actions proposed within the framework of this . . . [environmental impact statement] will undergo consultation, either formal or informal, as appropriate."  (D.E. No. 52-5 at 50).  This statement appears in a section of the SWFEIS discussing "alternative predictions of future conditions."  *Id*. at 24.  This section specifically considers "predictions of future conditions" in southwest Florida "that could result from a combination of Corps and non-Corps decisions."  *Id*.  Each of these predictions are called "Ensembles," and each Ensemble includes a map of the landscape of southwest Florida as it may appear in around twenty years.  *Id*.

The Ensembles were created from a larger group of "predictions of future conditions" called "alternatives," which were developed by the Alternatives Development Group, a group of community and agency representatives.[18]  *Id*.  The quotation that Plaintiffs takes out of context is simply stating that the Corps did not consult with the FWS in creating the alternatives or the predicted future outcomes because these were not actual projects but rather imagined scenarios.  *See id*. at 50-51.  In the section highlighted by Plaintiffs, the SWFEIS makes it clear that any

---

[18]The Alternatives Development Group worked on these alternatives and Ensembles "but had no part in preparation of the proposed action or environmental analysis."  (D.E. No. 52-5 at 2).

actual actions or projects will have to undergo formal or informal consultation as appropriate.[19]

*Id*.  This section does not state as Plaintiffs argue that the Corps failed to consult with the FWS in

the preparation of the SWFEIS.

In reality, the SWFEIS demonstrates that the Corps did consult with the FWS in its

preparation.  *See* (D.E. No. 62-6 at 29) (showing that the SWFEIS was both reviewed and

prepared by the Corps, the FWS, and others); (D.E. No. 52-5) (stating in the "affected

environment" section that the Corps "through consultation with the USFWS, has determined that

seventeen listed faunal species which occur in the study area could be affected by the proposed

project."); *see also* (D.E. No. 44-12) (stating that in the SWFEIS the Corps along with the U.S.

Environmental Protection Agency and the FWS developed "descriptions of the existing natural

resource conditions, analysis of historic vegetation, report of permitting information, description

of socio-economic considerations, evaluation of endangered species effects, and assessments of

water quality.").  Thus, the Court finds that the Corps did comply with section 7(a)(1) of the

ESA.

## B.    The Clean Water Act

Next, Plaintiffs argue that the Corps has violated the CWA.  The CWA seeks "to restore

and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. §

1251(a).  In accordance with this, the CWA prohibits "the discharge of any pollutant" including

---

[19]The SWFEIS states that "[t]he reader is cautioned that the Ensembles are simply
predictions of the future, based on anticipated actions by city, county, State, and Federal
governments, as well as private industry.  These predictions had, and have, no purpose other than
to identify the most important resources that would be affected in the future."  (D.E. No. 52-6 at
2-3).

dredge or fill material into waters of the United States[20] unless a permit from the Corps has first

been secured.  33 U.S.C. §§ 1311(a), 1344(a). Applications for section 404 permits are reviewed

under guidelines established by the Environmental Protection Agency Administrator.  33 U.S.C.

§ 1344(b)(1).  These guidelines state in relevant part that (1) "no discharge of dredged or fill

material shall be permitted which will cause or contribute to significant degradation of the waters

of the United States;" (2) "no discharge or fill material shall be permitted if there is a practicable

alternative to the proposed discharge which would have less adverse impact on the aquatic

ecosystem, so long as the alternative does not have other significant adverse environmental

consequences;" and (3) "no discharge of dredged or fill material shall be permitted unless

appropriate and practicable steps have been taken which will minimize potential adverse impacts

of the discharge on the aquatic ecosystem."  40 C.F.R. §§ 230.10 (a),(c), & (d).  Plaintiffs argue

that the Corps's findings in their environmental assessment relating to these three requirements

are arbitrary and capricious and in violation of the CWA.  After careful consideration, this Court

finds that the Corps did not violate the CWA.

### 1.    Assessment of the Degradation of Waters of the United States

First, Plaintiffs argue that the Corps failed to properly assess the Mirasol project's effect

on the degradation of the waters of the United States. Under the regulations, "no discharge of

dredged or fill material shall be permitted which will cause or contribute to significant

degradation of the waters of the United States."  40 C.F.R. § 230.10(c).  In the environmental

assessment, the Corps found that the Mirasol project would not cause or contribute to the

---

[20]"Waters of the United States" is defined by regulation to include wetlands. 33 C.F.R. §
328.3(a) & (b).

significant degradation of the waters of the United States.  (D.E. No. 32-3 at 21).  Plaintiffs argue that in finding no significant degradation in their environmental assessment, the Corps improperly ignored evidence of cumulative degradation, improperly ignored evidence of cumulative flowway degradation, and improperly ignored evidence of cumulative habitat degradation.  Plaintiffs argue that "[a]t a minimum, the Corps . . . [failed] to develop 'sufficient information to make a reasonable judgment' that Mirasol's cumulative adverse effects would not 'cause or contribute to significant degradation of waters of the United States.'" (D.E. No. 31-2 at 280) (quoting 40 C.F.R. § 230.10(c); 40 C.F.R. § 230.12(a)(3)(iv)).  After careful consideration, this Court finds that the Corps's finding of no significant degradation was not arbitrary, capricious, contrary to law, or an abuse of discretion.

Plaintiffs specifically argue that the Corps in finding no significant degradation ignored evidence in the record of cumulative degradation because the Corps did not consider the findings in the SWFEIS, the Corps 2005 environmental assessment, and recommendations in EPA letters and instead improperly relied "exclusively on the . . . [South Florida Water Management Distirct's ("SFWMD")] review of IMC's narrow water quality analysis." (D.E. No. 31-2 at 19); (D.E. No. 53 at 19).   The environmental assessment, however, demonstrates that the Corps did consider and discuss the SWFEIS in its analysis and did not rely exclusively on the SFWMD's review of IMC's water quality analysis. *See* (D.E. No. 32-2, environmental assessment at 21, 29-32).  Moreover, there is no requirement that the Corps explicitly discuss certain sources of information in the environmental assessment, such as the 2005 environmental assessment and

-32-

certain EPA letters,[21] nor is there any indication that its failure to discuss such documents automatically renders the environmental assessment arbitrary, capricious, contrary to law, or an abuse of discretion.   The Court also finds that the Corps's finding of no significant degradation did adequately consider the cumulative effects on the waters of the United States and that is was not arbitrary, capricious or an abuse of discretion for the Corps to rely on the SWFMD's assessment of the applicant's water quality analysis.

Under the regulations, the Corps must "determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment. . . ."  40 C.F.R. § 230.11.  The determinations of effects of each proposed discharge" must include the

> [c]umulative effects attributable to the discharge of dredged or fill material in waters of the United States . . . to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications, the issuance of a General permit, and monitoring and enforcement of existing permits.

40 C.F.R. § 230.11(g).  In the environmental assessment, the Corps applies the standardized permit criteria delineated in the SWFEIS to the Mirasol project in analyzing the cumulative and secondary impacts.  (D.E. No. 32-3, environmental assessment at 29-32)  In considering these factors with respect to the waters of the United States, the Corps concludes that "the project has been designed to include the preservation of wetlands and lakes," that while the Mirasol project is located in an area with "a high proportion of wetlands" the permit applicant "has reduced

---

[21]In fact, the environmental assessment indicates that the Corps and the EPA consulted on many occasions in the preparation of the environmental assessment.  *See* (D.E. No. 32-2, environmental assessment at 5-8, 21, 33-35).

impacts to the maximum extent practicable," and that "the project will not have a cumulative impact on water quality as documented by procedures developed by [the] EPA and the Corps." *Id*. at 31.  The Corps concludes that "[o]verall, the project is somewhat consistent with the various options available under the . . . [SWFEIS] and within the range of cumulative impacts and secondary impacts."  *Id*. at 32.  The Corps also finds that "the project does provide one of the key elements of the . . . [SWFEIS], in that it provides a portion of a large preserve area between the Corkscrew Swamp and the Cocohatchee Canal."  *Id*.

       With respect to the analysis of water quality, the Corps noted that "storm water discharges are a contributing factor that are causing or contributing to the degradation of receiving waters."  *Id*. at 21.  In order to address concerns relating to water quality, the permit applicant in this case submitted "a water quality analysis of pre- and post-development nitrogen loading estimates."  *Id*. at 22.   This analysis was reviewed by the SFWMD, and the SFWMD confirmed that "the surface water management system for Mirasol is designed to reduce the post-development loadings of storm water nutrients to values that are equal to or less than pre-development."  *Id*.  The SFWMD also concluded that the Mirasol project would not contribute to the impairment of the water quality of the Cocohatchee Canal and that the project would provide water quality based on 1.5 inch over the development site where only 1 inch over is required.  *Id*.  The Corps concluded that "the project . . . followed SFWMD and EPA's procedures to ensure that the project does not cause or contribute to significant degradation of waters of the United States." *Id*.  Thus, the Court finds that the environmental assessment demonstrates that the Corps did make findings in writing as to the cumulative effects attributable to the discharge of dredge or fill materials into the waters of the United States.

-34-

The Court also finds it was not arbitrary, capricious, contrary to law, or an abuse of discretion for the Corps to rely on SFWMD's assessment of the applicant's water quality analysis. "The Corps'[s] regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an . . . [environmental assessment]." *Friends of the Earth v. Hintz*, 800 F. 2d 822, 834 (9th Cir. 1986). Here, the record indicates that although the Corps did rely on the SFWMD's assessment, their total assessment of whether the Mirasol project would result in a significant degradation of the waters of the United States was based on their own assessment and independent analysis. *See* (D.E. No. 32-2, environmental assessment at 5-8, 21-22, 29-32). Thus, the Court finds that the Corps's assessment of the cumulative effects was not arbitrary, capricious, contrary to law, or an abuse of discretion.

Next, Plaintiffs specifically argue that the Corps in finding no significant degradation inappropriately dismissed "flooding concerns raised." (D.E. No. 31-2 at 20). In the environmental assessment, the Corps, however, thoroughly discusses the flood hazards of the Mirasol project. The environmental assessment states that:

> [t]he surface water management system for the project has been designed to ensure flood stages will not stage higher than existing conditions. The system will allow natural surface flows through the main wetland preserve and adjacent wetland areas until the wet season water level is met in adjacent wetlands (14.00 feet NGVD). At that time off-site flows will be allowed onto the site and eventually discharge into the Cocohatchee Canal. The compensatory storage for the displaced flood waters are within the development. The overall design maintains the existing stages for surrounding areas while providing protection for the development.
>
> In addition [to] maintaining existing stages, the project will not increase storm water discharge rates into the Cocohatchee or downstream receiving waters. Discharge rates are slightly reduced by the project. During the 25-year 3-day-storm event the existing discharge from the project site and areas west, is

estimated at 553 cubic feet per second (cfs).  Based on the proposed storm water
management system the estimated discharge is 529 cfs. Therefore, the project will
not exacerbate flood hazards in the area, cause flooding on the site, or increase
discharge rates into receiving waters.

(D.E. No. 32-3, environmental assessment at 24-25).  The Corps also found that "[t]he surface

water management system . . . [was] designed to ensure areas upstream, adjacent and receiving

waters downstream are not impacting floodplain values in terms of water quantity and flood

storage."  Thus, it is clear that the Corps sufficiently analyzed and considered the cumulative

flood hazards in their environmental assessment.  *See* 33 C.F.R. § 320.4(l).

Plaintiffs also argue that the Corps in reaching their conclusions "ignored" certain record

evidence.  First, there is no indication that the Corps "ignored" any of the evidence.  To the

extent, Plaintiffs disagree with the Corps' finding that the Mirasol project will not exacerbate

flood hazards in the area, the Court finds such arguments inappropriate.  The appropriate inquiry

is whether such a finding was arbitrary, capricious, contrary to law, or an abuse of discretion.

Here, there is no indication in the record that it was.  *See, e.g.*, (D.E. No. 41-8 at 23, 32-33)

(confirming the Corps's findings regarding the Mirasol project and the potential flood hazard).

Moreover, Plaintiffs inaccurately argue that the Corps ignored the SWFEIS in reaching

their conclusion because the SWFEIS found that the Mirasol project would cause a flood hazard.

(D.E. No 31-2 at 20) (stating that "[t]he SWFEIS singles out projects like Mirasol as harmful

because they convert SW Florida's natural flowways to drainage canals, block the natural flow

with roads and berms, and drain and fill portions of these flowways). The SWFEIS, which

considers predicted futures does not discuss the Mirasol project or any other specific project.  *See*

(D.E. Nos. 44-11, 44-12, 44-13, 52-5, 52-6).  In addition, as previously discussed, the Corps does

consider the SWFEIS in its environmental assessment.  (D.E. No. 32-3, environmental

assessment 29-32).  Also, to the extent Plaintiffs are arguing that the Corps ignored evidence

relating to the Mirasol flowway, this flowway was disapproved in 2005 and is not a part of the

permitted project.  *See* (D.E. No. 32-12 at 22, 25-26); (D.E. No. 41-8 at 16, 26).

Finally, Plaintiffs specifically argue that the Corps in finding no significant degradation

ignored the evidence "that Mirasol and adjacent wetlands provide vital habitat for the endangered

stork, Florida panther, and other valuable wildlife."  (D.E. No. 31-2 at 28).  Plaintiffs again cite

the SWFEIS as the evidence Defendants ignored.  However, as discussed above, the SWFEIS did

not specifically consider the Mirasol project or any other specific project.  Moreover, the

environmental assessment considered the SWFEIS and sufficiently discussed the cumulative

impacts on the endangered species and other wildlife.  *See* (D.E. No. 32-3, environmental

assessment at 27-32). Accordingly, the Court finds that the Corps's finding of no significant

degradation was not arbitrary, capricious, contrary to law, or an abuse of discretion.[22]

### 2.      Assessment of Practicable Alternatives

Next, Plaintiffs argue that the Corps violated the CWA because it did not demonstrate

that there are no practicable alternatives to the issuance of the permit. The regulations provide

that "no discharge or fill material shall be permitted if there is a practicable alternative to the

proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as

the alternative does not have other significant adverse environmental consequences." 40 C.F.R. §

230.10(a).  A practicable alternative is one that "is available and capable of being done after

---

[22]To the extent, however, that the Corps relied on the portions of the FWS's biological opinion that the Court has already found were arbitrary and capricious with regard to the wood stork, the agency may wish to reconsider its findings in the environmental assessment in light of any new biological opinion issued by the FWS.  The Court notes, as explained below, that the environmental assessment is being declared invalid regardless.

taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). An area not owned by the applicant may still be a practicable alternative if it "could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." *Id.* Where a project is not water-dependent, such as the one at issue in this case, it is presumed that practicable alternatives exist. 40 C.F.R. § 230.10(a)(3). "The presumption for a non-water dependent project that a practicable alternative exists is not an automatic bar on issuance of a permit, but it does require that an applicant make a persuasive showing concerning the lack of alternatives." *Utahns for Better Transp. v. U. S. Dep't of Transp.*, 305 F. 3d 1152, 1163 (10th Cir. 2002).

Plaintiffs argue that the Corps's assessment of practicable alternatives was arbitrary, capricious, contrary to law, or an abuse of discretion because the Corps's alternatives analysis was premised on a narrow overall project purpose already rejected by the Corps in 2005, the Corps failed to independently verify the applicant's rejection of alternative sites, and the Corps failed to vigorously examine on-site alternatives which would limit the Mirasol project's footprint. After careful consideration, the Court finds Plaintiffs have not demonstrated that the Corps's assessment of practicable alternatives was improper under the deferential standard of review in this case.

First, the Court does not find that the Corps's assessment was inadequate because it was based upon an overly narrow project purpose nor does the Court agree that this same project purpose was previously rejected by the Corps in 2005. In the 2005 environmental assessment, the project purpose was "to construct an economically viable upscale residential and golf course community in northern Collier County west of CR 951 and in close proximity to an activity

-38-

center." (D.E. No. 32-12, 2005 environmental assessment at 8). The Corps characterized this as an "overly narrow definition of project purpose" and more importantly, found that "the applicant failed to demonstrate that there are no practicable or less damaging alternatives to the flow-way construction." *Id*. at 23. In contrast, in the 2007 environmental assessment, the basic project was "to construct a residential community," whereas, the more specific overall project purpose was "to construct an economically upscale residential community with two 18-hole golf courses and associated amenities in northern Collier County." (D.E. No. 32-3, environmental assessment at 10). In addition, the project reviewed by Corps in 2007 did not include a flow-way. *Id*. at 15. The Court does not find it determinative that both environmental assessments used the same six primary search criteria. The Court finds the overall project purpose in the 2007 environmental assessment defines the applicants's needs without being so unduly restrictive as to preclude practicable alternatives. Thus, the Court finds no reason to find the Corps's assessment of the practicable alternatives in the environmental assessment arbitrary, capricious, contrary to law, or an abuse of discretion.

The Court also does not find that the Corps failed to independently verify the applicant's rejection of alternative sites. Specifically, Plaintiffs argue that the Corps allowed the applicant to ignore and summarily reject available sites, Mediterra Lee and Parklands East/West site, that the Corps improperly allowed the applicant to reject sites based on size, and that they failed to question the rejection of the Heritage Bay site. Plaintiffs also argue that Mirasol does not satisfy the specific search criteria that the site be "developed in an environmentally practicable manner." (D.E. No. 31-2, environmental assessment at 11). The Court finds, however, that all of these arguments are again Plaintiffs' disagreements with the merits of the Corps's decisions. There is

no indication that the Corps's decisions on these issues were arbitrary, capricious, contrary to law or an abuse of discussion.

The Corps discusses the rejection of the Mediterra Lee site, the Parklands East/West site, and numerous other sites in their environmental assessment. *Id*. at 11-14. Thus, the Corps did not ignore these sites. Nor can it be said that these sites were "summarily rejected" as the Corps lists reasons for why these sites were not practicable alternatives, and the Court does not find that the reasons listed for the rejection of these sites was improper under the deferential standard of review in this case. *See id*. There is also no evidence that it was arbitrary, capricious, contrary to law, or an abuse of discretion for the Corps to allow the applicant to reject parcels based on size.[23] The Corps also discusses the rejection of the Heritage Bay site in the environmental assessment, which failed to meet a number of the specified criteria including that it did not meet the local land use criteria and that it was not available. *Id*. at 12. There is again no indication that the reasons listed by the Corps were arbitrary, capricious, contrary to law, or an abuse of discretion. Finally, Plaintiffs' argument that the Mirasol site is not a site that could be developed in an environmentally practicable manner is Plaintiffs' opinion with regard to this entire case; however, Plaintiffs' opinion is not an appropriate basis for remand or reversal under the deferential standard of review.

Finally, the Court disagrees that the Corps inappropriately failed to investigate limiting Mirasol's on-site footprint. There is sufficient evidence in the record that the Mirasol project changed over time because of different decisions made by the Corps. For example, the Corps

---

[23]Although Plaintiffs are correct that smaller parcels can be combined to make larger parcels, there is no indication that a sufficient group of smaller parcels were available that met the overall project purpose.

disapproved the construction of the flow-way, and this was eventually removed from the project, eliminating "87 acres of wetland impacts" and allowing for "more land preservation." (D.E. No. 32-3, environmental assessment at 15); *see also* (D.E. No. 32-12, 2005 environmental assessment at 10). The Mirasol site was also modified, relocating golf holes "to be adjacent to the wetland preserve as a buffer area." (D.E. No. 32-3, environmental assessment at 15).

Plaintiffs also argue that the Corps did not properly limit the footprint of the Mirasol project because it allowed the applicant to inappropriately focus on maximum profit for their development rather than economic viability as the applicant's site search was restricted to those sites that could support two eighteen-hole golf courses. Evidence in the record, however, supports the Corps's decision to allow the applicant to include a site that could support two eighteen-hole golf courses in their overall project purpose. (D.E. No. 48-2 at 15); *see also* (D.E. No. 48-9 at 14-15). There is no indication that this decision was arbitrary, capricious, contrary to law, or an abuse of discretion.

### 3.    Minimization Determination

Finally, Plaintiffs argue that the Corps violated the CWA in failing to require adequate mitigation. The regulations provide that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). Plaintiffs specifically argue that the mitigation plan is inadequate because it does not replace the 645 wetland acres destroyed, it improperly relies on the applicant's Wetland Rapid Assessment Procedure ("WRAP") analysis, it allows for an additional preservation credit for long-term protection and management that was already required, and it fails to account for the "foreseeable"

degradation of the wetlands in the preserve.  After careful consideration, the Court finds

Plaintiffs have not demonstrated that the Corps's minimization determination was improper

under the deferential standard of review in this case.

First, the Court disagrees with Plaintiffs' contention that the mitigation plan is inadequate

because it does not replace the 645 acres destroyed. The Corps found that the Mirasol project

would impact 645.35 acres of wetlands or other waters.  (D.E. No. 32-3, environmental

assessment at 16). To compensate for the loss of these wetlands, the Corps required the permitee

to preserve, enhance, manage, maintain, and monitor 54.52 acres of wetlands and 2.24 acres of

uplands within the Mirasol development.  *Id.* at 16, 18-19.  It also required the permitee to

preserve, enhance, manage, maintain and monitor 776.83 acres of wetlands and 106.88 acres of

uplands in an area north of the Mirasol development.  *Id*.  The Corps required these acres to be

forever preserved and without modification absent additional authorization from the Corps.  *Id*.

at 18-19. The Corps also required the permitee to purchase 27.38 of wetland credits from the

Panther Island Mitigation Bank.  *Id*. at 18.  Plaintiffs argue that this mitigation plan simply

requires the preservation of existing on-site wetlands, removal of melaleuca from these existing

wetlands, and the purchase of a small number of mitigation bank credits.  The Court, however,

finds that Plaintiffs narrowly characterize the mitigation plan and that such plan is not

inappropriate.

The mitigation plan does more than just require the preservation of existing on-site

wetlands.  It requires the preservation, enhancement, management, maintenance and monitoring

of numerous wetland acres.  In addition, the environmental assessment states that 776.83 acres of

wetlands and 106.88 acres of uplands are located in an area north of the Mirasol development.

Moreover, evidence in the record indicates that on-site preservation is an appropriate part of compensatory mitigation.  (D.E. No. 36-4 at 13).  Furthermore, there is no indication that this mitigation plan was either arbitrary, capricious, contrary to law, or an abuse of discretion because of the nature of the compensatory mitigation or given the circumstances of this case.  There also is no indication that the minimization plan at issue in this case is in violation of 33 C.F.R. § 332.3,[24] which sets forth the general compensatory requirements and certainly allows for compensatory mitigation to take the form of preservation.  Thus, the Court finds Plaintiffs' arguments on this issue are without merit.

Second, the Court finds it was not inappropriate for the Corps to rely on a WRAP analysis.  The WRAP analysis used by the Corps:

> addressed the functional values of existing wetlands and predicts the functional values of preserved, enhanced, and restored wetlands following successful completion of the proposed project and proposed mitigation program.  Wetland polygons, as mapped accordingly to habitat type, were assigned functional credit values based on the ecosystem function they provide relative to a "fully-functional" wetland systems of similar type.  The functional credits for all polygons were then summed for both the pre-development condition and the post-development condition in order to compare functional losses (proposed project impacts) to functional gains (proposed mitigation).

(D.E. No. 32-3, environmental assessment at 17).  Plaintiffs argue that this analysis inappropriately discounted the value of the Mirasol wetlands due to the presence of melaleuca, that the Corps did not adequately explain their underlying assumptions in applying the post-development WRAP regarding the benefits of melaleuca removal, and that the Corps ignored evidence the record expressing criticism of the WRAP analysis.  The Court finds, however, that

---

[24]The Court notes that it has considered the version of section 332.3 in effect prior to June 8, 2008.

Plaintiffs did not inappropriately discount the wetlands, that they sufficiently explained their mitigation analysis, and that the use of the WRAP analysis was not arbitrary, capricious, contrary to law, or an abuse of discretion.

There is evidence in the record to support the conclusion that the presence of melaleuca diminishes the functionality of wetlands. *See, e.g.*, (D.E. No. 42-11); (D.E. No. 60-2).  Although the functionality of the existing wetlands was discounted due to the presence of melaleuca, the Corps did not completely discount the functionality of the wetlands at issue.  The Corps has stated that "[a] WRAP analysis includes variables for wildlife utilization, canopy and ground cover, habitat support/buffer, field hydrology, and water quality."  (D.E. No. 36-5, supplemental environmental assessment at 3). The Corps stated that in performing the WRAP analysis, it recognized "that the functional capacity of melaleuca wetlands does not drop to zero nor does the ecosystem 'crash' when melaleuca coverage exceeds 75%."  *Id*.  There is no indication that such analysis was inappropriate.  The Court also finds that the Corps sufficiently discussed their analysis in the environmental assessment; there is no indication that the Corps' failure to include more explanation was in any way arbitrary, capricious, contrary to law, or an abuse of discretion. *See Van Antwerp*, 526 F. 3d at 1361 (noting that under the APA an agency is entitled to considerable deference "when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue."). Finally, Plaintiffs have noted that the WRAP analysis has been criticized; however, this does not demonstrate that the WRAP analysis was inappropriate under the deferential standard of review applicable to this case.  There is also evidence that the WRAP analysis is an accepted assessment tool.  *See* (D.E. No. 34-10 at 4); (D.E. No. 36-5, supplemental environmental assessment at 3); (D.E. No. 49-5 at

3); *see also Fla. Keys Citizens Coal., Inc.*, 374 F.Supp.2d at 1155-57 (stating that the Corps's assessment of wetlands impact was supported where record showed the Corps addressed relevant factors through the Estuarine Wetland Rapid Assessment Procedure or the alternative acreage methodology).

The Court also finds that it was not arbitrary, capricious, contrary to law, or an abuse of discretion for the Corps to allow for an additional preservation credit for long-term protection and management because such protection and management was already required.  The Court finds that there is no indication that the allowance of this additional preservation credit was at all inappropriate and notes that the credit was given for more than just long-term protection and management.  The Corps allowed for an additional preservation credit of 44.19 functional units based on the permitee's eventual transfer of ownership of the 883.71-acre main preserve to the Corkscrew Regional Ecosystem Watershed Land Trust ("CREW"), the establishment of an escrow fund for perpetual maintenance, and "because . . . [this 883.71 acre] preserve forms a contiguous wetland system with upstream and down stream preserves."  (D.E. No. 32-3, environmental assessment at 17-18).

Finally, the Court finds that the Corps did not fail to account for the "foreseeable" degradation of the wetlands in the preserve.  Specifically, Plaintiffs argue that the Corps failed to account for "pollution of internal preserves, potential construction of a drainage ditch through the preserve, likely encroachment of the 951 extension through the preserve, and the potential long-term neglect of these wetlands after responsibility is transferred to the SFWMD (internal wetlands) and to CREW (main preserve)."  (D.E. No. 31-2 at 33).  The Corps, however, does require that the preserve wetlands be forever preserved and that no modifications be made to

these areas without first seeking further approval from the Corps.  (D.E. No. 32-3, environmental

assessment at 18).  It also requires the permittee to monitor the preserve lands. *Id*. at 18-19.  The

Corps has also required the preparation of a conservation easement with enforcement rights to

the Corps with regard to the internal preserve.  *Id*. at 18.   Prior to transfer of the main preserve to

CREW, the Corps has also required the establishment of an endowment fund "to ensure the

perpetual maintenance and management of the main preserve" after it is transferred to CREW

and documentation establishing that CREW now assumes full responsibility for the perpetual

maintenance of the main preserve. These requirements help to ensure the preservation of these

areas.  Plaintiffs have failed to demonstrate that it was arbitrary, capricious, contrary to law, or an

abuse of discretion for the Corps not to explicitly discuss in the environmental assessment each

of Plaintiffs' alleged possible degradation events, especially where the record clearly

demonstrates that the Corps has taken steps to prevent the degradation of the preserve lands.

Thus, the Court finds that the Corps has not violated the CWA.

### C.      The National Environmental Policy Act

Finally, Plaintiffs argue that the Corps has violated the NEPA.  The NEPA "is not a

substantive environmental statute which dictates a particular outcome if certain consequences

exist. Instead, NEPA creates 'a particular bureaucratic decisionmaking process.'" *Sierra Club v.

Corps*, 295 F. 3d 1209, 1214 (11th Cir. 2002) (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 497

(1st Cir. 1989)).  "NEPA ensures that the agency will not act on incomplete information, only to

regret its decision after it is too late to correct."  *Marsh v. Oregon Natural Resources Council*,

490 U.S. 360, 371 (1989).  Under NEPA, all federal agencies must prepare an environmental

impact statement  where the agency proposes a "major Federal . . . [action, which] significantly . .

. [affects] the quality of the human environment."  42 U.S.C. § 4332(2)(C).  In determining

whether an environmental impact statement is necessary and the affects of the action are

significant, an agency prepares an environmental assessment, which "serves to [b]riefly provide

sufficient evidence and analysis for determining whether to prepare an environmental impact

statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).  "Thus, an agency

will reach one of two conclusions in an . . . [environmental assessment]: 'either that the project

requires the preparation of an . . . [environmental impact statement] to detail its environmental

impact, or that the project will have no significant impact . . . necessitating no further study of the

environmental consequences which would ordinarily be explored through an . . . [environmental

impact statement].'"  *Hill v. Boy*, 144 F. 3d 1446, 1450 (11th Cir. 1998) (quoting *Sabine River

Auth. v. U. S. Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1992)).  NEPA also requires that all

federal agencies "study, develop, and describe appropriate alternatives to recommended courses

of action in any proposal which involves unresolved conflicts concerning alternative uses of

available resources."  42 U.S.C. § 4332(2)(E).  Plaintiffs argue that the Corps acted arbitrarily,

capriciously, contrary to law, and abused its discretion in failing to prepare an environmental

impact statement and in failing to sufficiently "study, develop, and describe appropriate

alternatives" to the Mirasol project in its environmental assessment.[25]

        After careful consideration, this Court finds that the Corps did not fail to take a "hard

_____

        [25]To the extent Plaintiffs are also arguing that the Corps should have prepared an
environmental impact statement in addition to the SWFEIS to address the effects of all of the
developments within the Cocohatchee watershed, the Court finds no requirement under the law
that the Corps prepare a cumulative environmental impact statement for multiple projects nor
have the Plaintiffs identified such a requirement.  Thus, the Court finds any failure to prepare
such an environmental impact statement was not arbitrary, capricious, contrary to law, or an
abuse of discretion.

look" at the impacts to the ecologically critical areas and that the Corps did not fail to "make a convincing case" that impacts to ecologically critical areas are insignificant. The Corps finds, however, that the Corps did fail to take a "hard look" at the cumulative impacts of Mirasol and nearby developments. The Court is unable to determine at this time whether an environmental impact statement was required based on the cumulative impacts, and the Court declines to reach this issue. The Court also declines to reach the issue of whether the Corps failed to take a "hard look" at the impacts to endangered species to the extent it relied on the FWS's biological opinion, and the issue of whether an environmental impact statement was required based on the impacts to endangered species.

### 1. Assessment of Significance of the Affect on the Quality of the Human Environment and Preparation of an environmental impact statement

Plaintiffs argue that the Corps's assessment of the significance of the affect on the quality of the human environment is insufficient in that the Corps should not have found that there was no significant impact and that the Corps was required to prepare an environmental impact statement. The regulations provide some guidance in defining the term "significantly" as used in NEPA. *See* 40 C.F.R. § 1508.27. One of the aspects that must be evaluated is the intensity or the severity of the impact, and in evaluating the intensity or severity of the impact, the agency, in relevant part, considers the "unique characteristics of the geographic areas such as proximity to . . . ecologically critical areas," "whether the action is related to other actions with individually insignificant but cumulatively significant impacts," and "the degree to which the action may adversely affect an endangered or threatened species or its habitat." *Id*. at § 1508.27(b)(3)(7) and (9).

-48-

> The District of Columbia Circuit has listed four criteria to be considered in determining whether an agency's decision not to prepare an . . . [environmental impact statement] is arbitrary and capricious: 'First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the . . . [environmental assessment]. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an . . . [environmental impact statement] can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.'

*Hill*, 144 F. 3d at 1450 (quoting *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66-67 (D.C. Cir. 1987)). Here, Plaintiffs argue that the Corps failed to take a "hard look" and "make a convincing case" with regard to its no significant impact finding as to the impacts on ecologically critical areas, as to the cumulative impacts of Mirasol and nearby developments and as to the impacts to endangered species.  After careful consideration, the Court finds that the Corps did not fail to take a "hard look" at the impacts to ecologically critical areas or to "make a convincing case" with regard to the impacts to ecologically critical areas but that the Corps did fail to take a "hard look" at the cumulative impacts of Mirasol and nearby developments. The Court declines to reach the other issues raised by Plaintiffs.

First, the Court disagrees that the Corps failed to take a "hard look" at the impacts to ecologically critical areas and disagrees that the Corps failed to "make a convincing case" that impacts to ecologically critical areas are insignificant.  Plaintiffs make the conclusory argument that the Corps's finding of no significance for this area must be arbitrary and capricious because the "site is an 'ecologically critical area,' dominated by wetlands that are an important part of a major historic flowway and provide[s] important flood storage, recharge, water purification, and wildlife habitat." (D.E. No. 27 at 34).  There is no indication in the environmental assessment

that the Corps failed to take a hard look at the impacts on this area or that it failed to make a convincing case of no significant impact.  *See* (D.E. No. 32-3, environmental assessment at 33-36).  As previously discussed, this Court does not find that the Corps's assessment of the area due to the presence of melaleuca or its mitigation calculations were insufficient or inappropriate.  *See supra* section III.B.3.  Thus, the Court finds this argument is without merit.

The Court, however, agrees that the Corps failed to take a "hard look" at the cumulative impacts of Mirasol and nearby developments and is unable to determine whether the Corps failed to "make a convincing case" that cumulative impacts of Mirasol and nearby developments are insignificant.  Plaintiffs argue that the Corps in its environmental assessment failed to take a "hard look" or "make a convincing case" as to these impacts because in the environmental assessment the Corps does not even mention "the combined impacts of development and almost 1,200 acres of wetland loss attributable to Mirasol, Saturnia Falls, Parklands, and Cypress Run, and the reasonable [sic] drainage ditch through the Cocohatchee Slough."  (D.E. No. 31-2 at 35).  Plaintiffs also argue that the environmental assessment is insufficient because it describes "but fails to analyze, the SWFEIS future landscapes ('ensembles')."  *Id*.  This Court agrees in that it finds that the Corps inappropriately failed to assess the cumulative impacts of the nearby developments.

As stated above, an environmental assessment "serves to [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).  In determining whether to prepare an environmental impact statement, the significance of the effect on the quality of the human environment must be assessed.  42 U.S.C. § 4332(2)(C). "Significance exists [and thus, an

-50-

environmental impact statement must be prepared] if it is reasonable to anticipate a cumulatively significant impact on the environment."  40 C.F.R. § 1508.27(b)(7).  A "[c]umulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  In the environmental assessment, the Corps acknowledges that the Mirasol project is next to several other permitted proposed developments, including Parklands, Saturnia, and an existing development, Olde Cypress. (D.E. No. 32-3, environmental assessment at 2).  There is, however, no discussion of the impacts of these other developments in conjunction with the Mirasol project in the environmental assessment.   The Court finds the Corps's failure to even discuss the cumulative impact of these developments in the environmental assessment is arbitrary, capricious, contrary to law, and an abuse of the Corps's discretion. *See Grand Canyon Trust v. F.A.A.*, 290 F. 3d 339, 342 (D.C. Cir. 2002) (stating that an "agency's . . . [environmental assessment] must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum."); *Ga. River Network v. United States Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1339 (N.D. Ga. 2003) (same).[26]  Because there is no analysis of these cumulative impacts, the Court finds it cannot determine whether or not it was inappropriate for the Corps not to prepare an environmental impact statement.  Thus, the Court remands this to the Corps to analyze the cumulative impacts of the other developments in the area in its

---

[26]The Court does not find that it was inappropriate for the Corps to fail to assess the implementation of the drainage ditch as the Court does not find any indication in the record that it was arbitrary, capricious, contrary to law, or an abuse of discretion for the Corps to find that such ditch was not reasonably foreseeable.

environmental assessment.[27]

The Court does not find that the Corps acted arbitrarily, capriciously, contrary to law or abused its discretion in failing to analyze the SWFEIS ensembles when assessing the cumulative impacts of the Mirasol project.  First, the Corps does assess the different criteria established in the SWFEIS in the environmental assessment.  *See* (D.E. No. 32-3 at 29-32).  Moreover, there is no requirement that the Corps use the different SWFEIS ensemble maps as part of the criteria in determining the significance of the cumulative impacts.  The SWFEIS is clear that each project

---

[27]At the hearing held on October 15, 2009, the Court specifically questioned the Defendants and the Intervenor on the issue of the cumulative impact analysis in the environmental assessment.  Neither the Defendants nor the Intervenor were able to state whether an analysis of the cumulative impacts was required in the environmental assessment under the law.  Defense counsel specifically stated that he didn't know whether the environmental assessment had to include such a discussion, but he conceded that if the Corps must consider it in the environmental assessment, the Corps must certainly discuss it.

As discussed above, this Court has found that the Corps did have to analyze the cumulative impacts, including the developments discussed above, in its environmental assessment.  The Court disagrees that any portion of the environmental assessment adequately addresses this issue and does not find the cumulative impacts discussion in the environmental assessment sufficient, where none of these developments are even mentioned. *See* (D.E. No. 32-3 at 29-32).  The brief discussion of the Mirasol project and the "predicted futures" does not sufficiently demonstrate that the Corps analyzed "other past, present, and reasonably foreseeable future actions" such as the developments as required under 40 C.F.R. § 1508.7.

Defendants and the Intervenor contended at the hearing that even if the environmental assessment did not include the required analysis, the record demonstrated that the Corps adequately considered the impacts of these other developments.  In support of these arguments, the Defendants and the Intervenor were only able to specifically cite to the Saturnia Falls environmental assessment (D.E. No. 32-10) and the Parklands environmental assessment (D.E. No. 33-2) in the record.  Even if the Court were to find that the Mirasol environmental assessment did not have to provide an analysis of these issues, which it does not, the Court does not find that these excerpts from the environmental assessments of two other developments demonstrate that the Corps sufficiently considered the cumulative impacts of the Mirasol project in conjunction with the other developments.  The excerpts from the Parklands environmental assessment and the Saturnia Falls environmental assessment in the record only mention the Mirasol project in passing and do not analyze the impacts of these other projects in conjunction with the Mirasol project.  *See* (D.E. No. 32-10 at 3); (D.E. No. 33-2 at 3, 11, 17).  Thus, the Court finds this argument is without merit.

must be assessed based on its specific circumstances.  (D.E. No. 52-5 at 30).

Finally, the Court declines to reach the issue of whether the Corps failed to take a "hard look" at the impacts to endangered species to the extent it relied on the portions of the FWS's biological opinion that this Court has already found were arbitrary and capricious, and the issue of whether the Corps failed to "make a convincing case" that the impacts to endangered species are insignificant.  This Court has already determined that the biological opinion must be remanded to the FWS for further consideration and thus, the Court finds it unnecessary to reach these issues at this time.  *See Norton*, 332 F. Supp. 2d at 185-86.

## 2.       Alternatives to the Permitted Action

Plaintiffs also argue that the Corps violated the NEPA in that its environmental assessment fails to adequately assess alternatives to the proposed project. The regulations require an environmental assessment to "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." Section 102(2)(E) of NEPA requires a federal agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  Plaintiffs argue that the Corps failed to evaluate "all reasonable alternative sites and designs that would avoid and minimize wetland impacts in the Cocohatchee Slough" and specifically failed to "consider alternative flood relief measures, including the required 'no action' alternative."  (D.E. No. 31-2 at 37).  The Court, however, disagrees that the environmental assessment failed to properly assess the available alternatives.  In the environmental assessment the Corps meets the requirements of the

NEPA by discussing numerous alternatives to the Mirasol site, including the no action alternative. *See* (D.E. No. 32-3, environmental assessment at 11-14). Thus, the Court finds this argument is without merit.

## IV. Conclusion

Thus, for the reasons set forth above, the Court finds that the APA, the ESA, and the NEPA have been violated. With regard to the violations of the APA and the ESA, the FWS's biological opinion was arbitrary and capricious based upon its failure to analyze the impacts of other federal projects in the area in analyzing the environmental baseline and based on the FWS's unexplained calculation of fish prey density in the opinion. To the extent the FWS relied on this unexplained calculation of fish prey density in calculating mitigation, in its assessment of the cumulative effects, or in any other respect the FWS's biological opinion was also arbitrary and capricious.[28] The Court declines to reach the issue of whether the Corps's reliance on this biological opinion with respect to these issues was arbitrary and capricious.

With regard to the APA and the NEPA, the Court finds that the Corps failed to take a "hard look" at the cumulative impacts of Mirasol and nearby developments in its environmental assessment. The Court declines to reach the issue of whether the Corps failed to take a "hard look" at the impacts to endangered species in its environmental assessment to the extent it relied on the portions of the FWS's biological opinion this Court has found were arbitrary and capricious. It also declines to reach the issue of whether an environmental impact statement was required based on the cumulative impacts and the impacts to endangered species.

---

[28]In addition, the FWS's calculation of the percentage finding of wetland loss was wrong. The loss is 0.2% not 0.02%. To the extent that this error was stated in the biological opinion, it should be corrected when the FWS revisits its biological opinion.

This Court declares the FWS's Mirasol biological opinion invalid and remands the Mirasol biological opinion to the FWS so that the FWS can prepare a complete and adequate biological opinion.  The Court acknowledges that with respect to the FWS's calculation of fish prey density this may simply involve an explanation of the reasons why the particular data was used rather than a recalculation.  The Court also declares the Corps's Mirasol environmental assessment invalid and remands the Mirasol environmental assessment to the Corps so that the Corps can prepare a complete and adequate environmental assessment.  Finally, the section 404(b) permit issued by the Corps for the Mirasol project, which has been transferred to the Intervenor is revoked and declared invalid. Accordingly, it is hereby:

**ORDERED AND ADJUDGED** that

1.      Plaintiffs' Motion for Summary Judgment (D.E. No. 31) is **GRANTED in part** and **DENIED in part**.

2.      Intervenor I.M. Collier, J.V.'s Motion to Strike Portions of Plaintiffs' Standing Declarations (D.E. No. 39) is **DENIED.**  However, as stated above, with the exception of the attached maps, the Court only considered these declarations for the purpose of establishing Plaintiffs' standing.

3.      Intervenor I.M. Collier, J.V.'s Cross-Motion for Summary Judgment (D.E. No. 40) is **GRANTED in part** and **DENIED in part**.

4.       Federal Defendants' Cross-Motion for Summary Judgment (D.E. No. 43) is **GRANTED in part** and **DENIED in part**.

5.      A final judgment shall be entered separately.

6.      The Mirasol biological opinion is declared invalid and is remanded to the FWS to

prepare a complete and adequate biological opinion.

       7.    The Mirasol environmental assessment is declared invalid and is remanded to the Corps to prepare a complete and adequate environmental assessment.

       8.    The section 404(b) permit issued by the Corps for the Mirasol project is revoked and declared invalid.

       9.    This case is **CLOSED** and all pending motions are **DENIED** as **MOOT**.

      DONE AND ORDERED in Chambers at Miami, Florida, this 23 day of October, 2009.


                                     _____
                                       JOSE E. MARTINEZ
                                       UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Lynch
All Counsel of Record